UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 13cr10180 |
| ) | |
| v. ) | VIOLATION: |
| ) | 18 U.S.C. § 1623 -- |
| ) | False Declaration Before Grand Jury |
| ILENE TERRELL, ) | |
| ) | |
| Defendant ) | |

## INDICTMENT

The Grand Jury charges that, at all times material hereto:

### THE DEFENDANT

1. The defendant **ILENE TERRELL** ("**TERRELL**"), a resident of Virginia, was a podiatrist practicing medicine at the Foot Doctor of Rappahannock, Ltd., located in Fredericksburg, Virginia.

### BONE GROWTH STIMULATORS AND THE MEDICARE PROGRAM

2. **TERRELL** prescribed bone growth stimulator medical devices for some of her patients who had broken or surgically-repaired bones. Bone growth stimulators were externally-worn medical devices that stimulated regeneration of bone cells.

3. Many of **TERRELL's** patients participated in the Medicare program. Medicare was enacted in 1965 as Title XVIII of the Social Security Act to pay for the cost of certain medical services and care for persons aged 65 and older, and for persons with disabilities. The Center for Medicare & Medicaid Services ("CMS") was a federal agency within the Department

of Health and Human Services ("HHS") that was responsible for the funding, administration and supervision of the Medicare Program.

4. Pursuant to sections 1832(a)(1) and 1861(n) of the Social Security Act, the Medicare Program paid for medical services and supplies that were medically necessary to treat a disease or a condition. Medicare included coverage for certain durable medical equipment ("DME"), including bone growth stimulators.

5. CMS published guidelines establishing when a bone growth stimulator was a covered expense for Medicare beneficiaries. For instance, Medicare paid for a bone growth stimulator only if the patient had a "nonunion of a long bone fracture." A "nonunion" was defined as "radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the [bone growth] stimulator." Medicare required that the DME supplier obtain two sets of radiographs "separated by a minimum of 90 days."

6. As a precondition to payment for a bone growth stimulator, Medicare also required "a written interpretation by a physician stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs." If this criterion was not met, Medicare would not pay for a bone growth stimulator.

7. Several private insurance carriers in Virginia also followed Medicare's guidelines with respect to reimbursement for bone growth stimulators.

8. Orthofix, Inc. ("Orthofix") was a corporation that manufactured and distributed bone growth stimulators. Orthofix was an accredited DME supplier enrolled in the Medicare program. As an accredited supplier, Orthofix was authorized to submit claims for reimbursement for bone growth stimulators directly to Medicare contractors.

9.   **TERRELL** sometimes prescribed Orthofix "Physio-Stim" bone growth stimulators for her patients. When she did so, an Orthofix Territory Manager typically obtained from **TERRELL's** office a prescription, the required medical records, and a Certificate of Medical Necessity ("CMN") to support the insurance claim. The Orthofix Territory Manager would forward these documents to Orthofix's home office. Orthofix maintained these records and electronically transmitted the information in the CMN to Medicare.

10.  Medicare paid Orthofix the lower of the actual fee for the item or the fee that Medicare approved for the item. The Medicare-approved amount for reimbursement of the Orthofix Physio-Stim bone growth stimulators varied over time, ranging from approximately $2,500 to more than $4,400 for each device.

THE MANIPULATION OF MEDICAL RECORDS RELATED TO BONE STIMULATORS

11.  Between at least 2006 and 2011, **TERRELL** prescribed the Orthofix Physio-Stim on many occasions. On some occasions, the order did not satisfy Medicare's guidelines or the guidelines of a private insurance carrier for reimbursement. **TERRELL** sometimes prescribed the device soon after the patient suffered the injury or had surgery. These claims were not reimbursable under insurance coverage rules because the patient's fracture healing had not ceased for three or more months prior to starting treatment with the bone growth stimulator (that is, there was no "nonunion"). If true and accurate information had been provided to Medicare or the private insurance carrier, these claims would not have been paid.

12.  On a number of occasions, faced with a patient for whom **TERRELL** wanted to use a bone stimulator but for whom insurance coverage rules barred reimbursement, an Orthofix Territory Manager, **TERRELL**, and/or one of **TERRELL's** employees, at **TERRELL's** direction, manipulated the patient's medical records to make it appear as though the patient's

order met insurance guidelines, to induce the insurance carrier to pay the claim that otherwise would not have been paid.

13.     For instance, when prescribing the Physio-Stim before 90 days had elapsed without clinically significant healing, **TERRELL** sometimes noted in the patient's medical record that she had prescribed the stimulator and/or that the patient was using the device. Medicare would not have paid these claims, as they were outside CMS guidelines. When this occurred, the Orthofix Territory Manager, **TERRELL**, and/or one of **TERRELL's** employees (at **TERRELL's** direction) often deleted the reference to the patient using the stimulator within the prohibited 90-day window in the Medicare order documentation that the Territory Manager sent to Orthofix. Thus, the medical records sent to Orthofix reflected a "clean" payable claim, when in fact Medicare would not have paid the claim if truthful information had been provided to the agency.

14.     On other occasions, after ordering a stimulator within the prohibited 90-day window, **TERRELL** noted in the patient's medical record that the patient's injury was healing or was essentially healed. Fully aware that Medicare would not have paid for a Physio-Stim in these cases (because 90 days had not elapsed without any clinically significant healing), the Orthofix Territory Manager would not submit the note that **TERRELL** had actually prepared. Instead, **TERRELL**, and/or one of **TERRELL's** employees (at **TERRELL's** direction) often prepared a fictitious note at the end of the 90-day period, falsely stating that the patient's bone was <u>not</u> healed and was in nonunion, and, as a result, **TERRELL** would order a stimulator for the patient. In fact, **TERRELL** had ordered the stimulator, and the patient had been using it, weeks or months previously (within the prohibited 90-day window). **TERRELL** also signed

bogus prescriptions and CMNs after the 90-day period elapsed for the Orthofix Territory Manager to submit in connection with the phony stimulator claims.

15. Medicare and other insurance carriers paid Orthofix for a number of bone growth stimulator claims that appeared to be payable claims but, in fact, did not satisfy insurance payment rules. Orthofix Territory Managers, including DD and DK, received commissions from these unlawful sales. **TERRELL** did not benefit financially from the scheme. **TERRELL** was aware of Medicare's guidelines regarding bone growth stimulators, but she believed that she should be able to treat patients as she saw fit, notwithstanding Medicare's reimbursement rules.

## THE ORTHOFIX RECORDS REQUEST

16. On November 21, 2011, Orthofix sent a letter to **TERRELL** requesting files for three patients. The purpose of the request was to ensure that Orthofix's bone growth stimulator claims were "accurate and meet applicable medical necessity coverage requirements for Medicare and other health care insurers."

17. Instead of immediately sending Orthofix the requested records, **TERRELL** asked DK, the Orthofix Territory Manager in her territory, to provide **TERRELL** with the documentation that DK had sent to Orthofix for these three patients. **TERRELL** then asked one of her employees to compare the Orthofix records with the records in the patients' files to ensure that there were no inconsistencies. Only after the records were compared did **TERRELL** comply with Orthofix's request.

## THE CALLS WITH DK

18. In April 2012, a grand jury in Boston, Massachusetts was investigating possible criminal violations relating to forging and/or manipulating medical records in connection with orders for bone growth stimulators, as well as other misconduct.

19. On or about April 9, 2012, the United States Attorney's Office in the District of Massachusetts served **TERRELL** with a grand jury subpoena, requesting certain patient files.

20. On April 11, 2012, **TERRELL** had a telephone conversation with DK lasting more than eight minutes. **TERRELL** and DK discussed the government's investigation related to Orthofix's and **TERRELL's** practices at length. **TERRELL** told DK that, "if my records don't match your records, somebody is gonna roll, and it isn't gonna be me."

21. Two days later, on April 13, 2012, **TERRELL** and DK had another telephone conversation. During this call, which lasted more than ten minutes, **TERRELL** and DK again discussed the government's investigation at length.

22. During the April 13th call, **TERRELL** admitted that she had manipulated patient records, at the request of Orthofix Territory Managers DD and DK, so that the claims would be paid.

23. During the April 13, 2012 conversation, **TERRELL** warned DK:

> If you guys take me out you are never going to live to hear the end of it . . . if I roll on this, I am serious, heads are going to roll, heads are absolutely gonna roll, because you guys have managed to get me in way, way over my head, way over my head.

## COUNT ONE
### (18 U.S.C. § 1623 – False Declaration Before a Grand Jury)

24. The allegations in paragraphs one through twenty-three are herein incorporated in full.

25. On May 22, 2012, in Boston, within the District of Massachusetts, defendant

**ILENE TERRELL,**

while under oath in a proceeding before the grand jury of the United States in the District of Massachusetts, knowingly made a false material declaration, that is, she gave the following underlined false testimony in response to a question concerning a material matter:

> Q Dr. Terrell, have you ever changed, altered or manipulated a medical record in order that an insurance company would pay for the bone stimulator?
>
> A <u>No.</u>

26. This testimony by defendant **TERRELL**, as she then and there well knew, was false in that in fact the defendant had changed, altered and manipulated medical records in order that an insurance company would pay for an Orthofix bone stimulator. The false statement was material because the U.S. Attorney's Office was investigating the manipulation of medical records in Dr. Terrell's office.

In violation of Title 18, United States Code, Section 1623.

## COUNT TWO
## (18 U.S.C. § 1623 – False Declaration Before a Grand Jury)

27. The allegations in paragraphs one through twenty-three are herein incorporated in full.

28. On May 22, 2012, in Boston, within the District of Massachusetts, defendant

**ILENE TERRELL,**

while under oath in a proceeding before the grand jury of the United States in the District of Massachusetts, knowingly made false material declarations, that is, she gave the following underlined false testimony in response to a question concerning a material matter:

> Q   You never had a conversation, up and including through today, with DD or DK about how, in some situations, they had to change the notes in order to get Medicare or Blue Cross Federal to pay a claim?
>
> A   <u>No.</u>

29. This testimony by defendant **TERRELL**, as she then and there well knew, was false in that in fact the defendant had had conversations with former Orthofix Territory Managers DD and/or DK about changing medical records so that Medicare would pay for the Orthofix bone growth stimulator. The false statement was material because the U.S. Attorney's Office was investigating the manipulation of medical records in Dr. Terrell's office.

In violation of Title 18, United States Code, Section 1623.

## COUNT THREE
### (18 U.S.C. § 1623 – False Declaration Before a Grand Jury)

30. The allegations in paragraphs one through twenty-three are herein incorporated in full.

31. On May 22, 2012, in Boston, within the District of Massachusetts, defendant

## ILENE TERRELL,

while under oath in a proceeding before the grand jury of the United States in the District of Massachusetts, knowingly made false material declarations, that is, she gave the following underlined false testimony in response to questions concerning material matters:

> Q     Had the Orthofix company contacted you for records before you got subpoenaed by the government?
>
> A     <u>I don't think so.</u> He got records whenever he needed records.
>
> Q     Not [DK], but had someone from the home office of Orthofix called you said, for whatever reason – internal audit, record checking, whatever the reason – "we need you to send us the charts on these five or ten [sic] patients"?
>
> A     <u>Not to my knowledge.</u>
>
> \* \* \* \* \*
>
> Q     You never heard from any – either anyone from Orthofix or any of your staff members that recently, within a few months, Orthofix was contacting your office and requesting patient files for certain patients who had received stimulators, and they wanted your records for those patients?
>
> A     <u>Not to my knowledge.</u>
>
> Q.     You never heard that happened?
>
> A.     <u>No sir, not to my knowledge.</u>

32.     This testimony by defendant **TERRELL**, as she then and there well knew, was false in that in fact **TERRELL** was well aware that, in November 2011, Orthofix had requested records for three of **TERRELL's** patients because (1) **TERRELL** had contacted DK instructing him to provide **TERRELL** with copies of the order documentation that DK had submitted to Orthofix for these same three patients; (2) DK provided **TERRELL** with these records; and (3) **TERRELL** had an employee compare the original patient records with the records submitted by DK to ensure that there were no inconsistencies. The false statements were material because the Orthofix request for records was related to the U.S. Attorney's Office's investigation of the manipulation of medical records in Dr. Terrell's office.

In violation of Title 18, United States Code, Section 1623.

## COUNT FOUR
### (18 U.S.C. § 1623 – False Declaration Before a Grand Jury)

33. The allegations in paragraphs one through twenty-three are herein incorporated in full.

34. On May 22, 2012, in Boston, within the District of Massachusetts, defendant

**ILENE TERRELL,**

while under oath in a proceeding before the grand jury of the United States in the District of Massachusetts, knowingly made false material declarations, that is, she gave the following underlined false testimony in response to question concerning material matters:

> Q   Was that the last time you talked to [DK]?
>
> A   No, in fact, it is not. I called him when I got this subpoena, and I said to him please tell me what this over [sic]. <u>And his answer to me was 'I can't tell you what this is over because I don't know.' And that was the last conversation. It was on the phone, and that was it. That was all the contact I had with him.</u>
>
> Q   Was that the sum total of the conversation you had?
>
> A   <u>That was it.</u>
>
> Q   How long did it last, 30 seconds or something like that?
>
> A   <u>Probably a minute and a half, okay. He said to me, 'I've been called to go to Boston,' he said, 'but I don't know what it's about.' And that is all I can tell you. He did not – He claimed to me that he didn't know what it was about.</u>

35. This testimony by defendant **TERRELL**, as she then and there well knew, was false in that in fact **TERRELL** and DK had two separate telephone conversations lasting more than eight minutes and more than ten minutes, respectively, and during these conversations they discussed the government's investigation and Orthofix's and **TERRELL's** manipulation

practices at length. The statements were material because the U.S. Attorney's Office was investigating the manipulation of medical records in Dr. Terrell's office.

In violation of Title 18, United States Code, Section 1623.

A TRUE BILL

/s/ Foreperson
FOREPERSON OF THE GRAND JURY

/s/
DAVID S. SCHUMACHER
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS: June 12, 2013

Returned into the District Court by the Grand Jurors and filed.

/s/ Thomas F. Quinn
DEPUTY CLERK    6/12/2013

@ 3:42pm